IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

THOMAS E. EVANS                    )
                                   )
v.                                 )        No. 2:10-0122
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security    )


To: The Honorable Thomas A. Wiseman, Senior United States District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("the Act").

Upon review of the administrative record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the meaning of the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 17) should be granted to the extent that this case should be remanded for further action in accordance with the recommendations contained herein.

1

# I. INTRODUCTION

The plaintiff filed applications for SSI and DIB on December 28, 2006, alleging a disability onset date of June 1, 2006, due to anxiety and Asperger Syndrome ("Asperger's"). (Tr. 100-06, 116.) His applications were denied initially and upon reconsideration. (Tr. 53-58, 63-66.) A hearing before Administrative Law Judge ("ALJ") K. Dickson Grissom was held on June 8, 2009. (Tr. 11-37.) The ALJ issued an unfavorable decision on September 1, 2009 (tr. 45- 52), and the plaintiff sought review by the Appeals Council. (Tr. 9.) On October 27, 2010, the Appeals Council denied the plaintiff's request for review (tr. 1-3), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on March 17, 1974, making him 32 years old as of June 1, 2006, his alleged onset date. (Tr. 100.) The plaintiff graduated from high school and completed additional training to become a certified nursing assistant in 2002. (Tr. 121.) He served in the Army for eight years as a medic before receiving a general discharge (tr. 416) and has worked as a certified nursing assistant (tr. 128) and temporary worker. (Tr. 17, 127-28.) The plaintiff's date last insured for DIB is September 20, 2009. (Tr. 38.)

## A. Chronological Background: Procedural Developments and Medical Records

### 1. Veterans Affairs Medical Records

On January 9, 2006, the plaintiff presented to Dr. Sheila Pertiller at the Department of Veterans Affairs Tennessee Valley Healthcare System ("VA") and complained of "being unable to

2

hold a job (unable to get along with other[s], train of thought is 'different,' difficulty focusing, [and] stays up late at night)." (Tr. 207.) Dr. Pertiller diagnosed him with possible "[a]nxiety/depressive disorder/anger problems" and referred him to a psychiatrist. (Tr. 209.) On January 10, 2006, Dr. Dara Johnson, an examining VA psychiatrist, noted that the plaintiff's mood was euthymic, his affect was appropriate, and his thought process was logical. (Tr. 207.) She assigned him a GAF score of 60[1] and diagnosed him with "r/o [rule out] Schizotypal personality disorder." (Tr. 196, 207.) On February 2, 2006, Dr. Lanny Leftwich, an examining VA psychiatrist, conducted a psychological assessment and diagnosed the plaintiff with "R/o Depression/IED [intermittent explosive disorder]/Social anxiety d/o" and "Schizotypal PD [personality disorder]." (Tr. 204-07.) Dr. Leftwich assigned the plaintiff a GAF score of 55 and prescribed Risperdal.[2] (Tr. 206.)

On March 22, 2006, Dr. Kimberly Marshman, Ph.D., an examining VA neuropsychologist, completed a neuropsychological evaluation and diagnosed the plaintiff with Asperger's.[3] (Tr. 202.)

_____

[1] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

[2] Risperdal is prescribed for schizophrenia, manic episodes of a bipolar disorder, and autism. Saunders Pharmaceutical Word Book 618 (2009) ("Saunders").

[3] Dr. Marshman explained that Asperger's syndrome
is a developmental disability, closely akin to the autism spectrum of disorders. In contrast to Autism, however, people with Asperger's syndrome have normal intellectual functioning and language development. Both, however, share the characteristic of pervasive social interaction difficulties, but with Asperger's, this is due to an inability to comprehend the nonverbal nuances governing social behaviors and social interactions. This type of difficulty makes interpersonal interactions difficult and frustrating. They cannot understand why people with whom they are interacting tend to reject them. They do desire social interactions, in contrast to people with Autism, but have extreme difficulty establishing long-term meaningful

She noted that during the evaluation the plaintiff diverted the conversation to unrelated topics, exhibited difficulty responding to feedback, had feelings of social isolation and resentment, had difficulty with social interactions, and had average intellect but good judgment, awareness, insight, and mood. (Tr. 200-01.) Dr. Marshman concluded that the plaintiff did not have schizotypal personality disorder, that his attention problems did not meet the criteria for Attention Deficit Hyperactivity Disorder ("ADHD"), and that his depression was due to his awareness of his interpersonal issues and was not "severe enough to be diagnosed as a major depressive episode." (Tr. 202.)

Dr. Marshman found that the plaintiff's Asperger's would "impede" his ability to work in jobs "that involve a high degree of public contact," but that he "does have the intellectual capacity to learn new information and the memory capacity to retain it." *Id*. She noted that the plaintiff would "probably perform adequately in a training program that involved information which is interesting to him and that he can learn by repetition." *Id*. Dr. Marshman encouraged the plaintiff to "continue medication management with his psychiatrist, as this seems to have been helpful;" explained that his "attention skills on testing are intact, and that it is likely that his shifting thoughts are the source of his perceived 'attention' problems;" and recommended that he take part in a vocational rehabilitation program and a skill-based therapy program. (Tr. 202-03.)

On April 14, 2006, the plaintiff returned to Dr. Leftwich and reported sleeping better and "mild" improvement in his concentration, but that he was still having "difficulty interacting and

relationships and even maintaining working relationships. While some of the symptoms of Asperger's overlap with schizotypal personality disorder and social anxiety disorder, the [plaintiff's] presentation did not demonstrate the degree of paranoid and disturbed thinking that is usually found with schizotypal PD.
(Tr. 202.)

4

relating to others." (Tr. 196.) Dr. Leftwich diagnosed him with Asperger's, prescribed Risperdal, and assigned him a GAF score of 60. (Tr. 196-97.)

Between June and September of 2007, the plaintiff presented to Dr. Joan Woods, an examining VA psychiatrist, on several occasions and she diagnosed him with Asperger's, prescribed Ritalin,[4] and referred him for Cognitive Behavioral Therapy. (Tr. 306-13.) The plaintiff related to Dr. Woods that Ritalin "helped some with clearer thinking." (Tr. 312.) In August and November of 2007, Dr. Leftwich examined the plaintiff on several occasions, diagnosed him with Asperger's, prescribed Ritalin, and noted that it was difficult for him to understand why the plaintiff was "turned down" for social security disability since he "is clearly going to have marked difficulties maintaining sustained, gainful employment due to his Asperger's Condition." (Tr. 299, 307.) The plaintiff also related that he was taking eight hours of classes at Nashville State Community College ("Nashville State") and that he "can't tell any difference" when on medication, but his mother reported that he is "more perky, he laughs and talks more now" since taking Ritalin. (Tr. 307.)

On January 14, 2008, the plaintiff presented to Dr. Leftwich and related that he got a "B" and a "C" in his first semester classes at Nashville State, that his current courses were "going okay thus far," and that he had helped his mother with yard work. (Tr. 294-95.) Dr. Leftwich noted the plaintiff "[c]ontinues [having] difficulty with interpersonal relationships due to his illness" and diagnosed him with Asperger's and Attention Deficit Disorder ("ADD"). (Tr. 295.)

On January 30, 2008, the plaintiff presented to Dr. Michael Campbell, an examining VA psychologist, upon referral from Dr. Leftwich for psychotherapy. (Tr. 290-91, 293.) The plaintiff complained of difficulty with social situations and Dr. Campbell found that the plaintiff's "off the

---

[4] Ritalin, also known as Methylphendiate, is used to treat ADHD. Saunders at 446, 618.

wall/ideosyncratic [sic] humor [] would be appreciated by few" and that the plaintiff laughed frequently "at content that would not be considered to be generally humorous." (Tr. 290-91.) Dr. Campbell determined that the plaintiff's affect was "somewhat restricted," his thought process was logical but eccentric, his insight and memory were adequate, and his judgment and abstract reasoning were intact, and diagnosed him with Asperger's and ADHD. (Tr. 293.)

In April, June, and September of 2008, the plaintiff presented to Dr. Leftwich and related that he was "doing 'the same,'" was in a "good" mood, was still taking classes at Nashville State, and was communicating with people over the internet; that his energy was "fine;" that he attended "one individual therapy session but failed to return since;" and that he had motivation but felt depressed and was having difficulty "with interpersonal relationships due to his illness." (Tr. 279, 282, 285.) Dr. Leftwich diagnosed him with Asperger's and ADD, not otherwise specified ("nos"), and prescribed Effexor[5] and Ritalin. *Id.* On April 30, 2008, the plaintiff presented to Dr. Campbell and related that he is not able to maintain relationships because "'[p]eople don't like me . . . socially inept . . . everything I liked as a kid is gone . . . I never wanted to change'" and that "[h]e feels alienated, isolated, alone/lonely, and disillusioned." (Tr. 284.) Dr. Campbell diagnosed the plaintiff with Asperger's and ADHD. *Id.*

On October 3, 2008, the plaintiff returned to Dr. Campbell and he noted that the plaintiff was "erratic and not reliable at keeping appts [appointments] which is consistent with his rather disorganized thinking and lifestyle," that he was "rather inept" in maintaining social relationships because "he makes frequent remarks that seem intended to be humorous but are likely to be

_____

[5] Effexor is prescribed for major depressive disorder, generalized anxiety disorder, social anxiety disorder, and panic disorder. Saunders at 255.

perceived negatively," and that he rambles. (Tr. 277.)  The plaintiff related that "[h]e feels that with the [R]italin and his own efforts, he has made some progress in his ability to focus." *Id*. Dr. Campbell diagnosed the plaintiff with Asperger's and ADD. *Id*.  On November 5, 2008, Portia Garrett, a VA nurse, examined the plaintiff and concluded that he was not depressed. (Tr. 333-35.)

On November 14, 2008, the plaintiff presented to Dr. Campbell and he found that the plaintiff was "[a]lert, cooperative, readily talkative if somewhat tangential and rambling, not psychotic, [and had] no safety issues," and he diagnosed him with Asperger's and ADD. (Tr. 330.) The plaintiff returned to Dr. Campbell on December 17, 2008, and he noted that the plaintiff's session was "devoted to an examination of his ambivalence about social relationships and how he insists on doing what he prefers to do rather than what is expected of him."  Dr. Campbell opined that the session was "productive" and that the plaintiff was "alert, attentive, more[ ] focused and less tangential;" and he continued to diagnose the plaintiff with Asperger's. *Id*.  On December 22, 2008, the plaintiff presented to Dr. Leftwich and related that he was "doing alright" and that "he [had] met a group of friends at a local restaurant over the weekend to play some games." *Id*.  Dr. Leftwich diagnosed him with Asperger's and ADD and prescribed Ritalin and Effexor. *Id.*

On January 15, 2009, the plaintiff presented to Dr. Campbell and he found that the plaintiff was "[r]eadily talkative in a rather rambling/non focused fashion, coherent, significant fantasy component to presentation with no evidence of psychosis, no safety issues, [and] he describes his mood 'good' with matching affect." (Tr. 327.)  Dr. Campbell noted that when the plaintiff "beg[an] to speculate on philosophical/metaphysical concepts," which would be "of little interest in most social situations," he was able to steer the topic back to the plaintiff's difficulties with social interaction. *Id*.  The plaintiff related that he had made "semi resolutions of trying to be more

considerate of others and to attempt to compromise" and Dr. Campbell diagnosed him with Asperger's. *Id.*

The plaintiff presented to Dr. Leftwich on April 1, 2009, and reported that he changed schools and had enrolled at Tennessee Tech University ("Tennessee Tech"), that he had bought a dog, and that his mood was "alright." (Tr. 345.) Dr. Leftwich found the plaintiff's affect to be "euthymic, calm, [and] cooperative" and his thought process and content to be "coherent, aloof, [with] no psychotic content." *Id.* He diagnosed the plaintiff with Asperger's and ADD, nos, and prescribed Effexor. *Id.*

On May 7, 2009, Dr. Leftwich completed a mental Medical Assessment of Ability to Do Work-Related Activities ("Medical Assessment") (tr. 378-80) and determined that the plaintiff had poor or no ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stresses; function independently; maintain attention and concentration; understand complex and detailed job instructions; behave in an emotionally stable manner; relate predictably in social situations; or demonstrate reliability. (Tr. 378-79.) He also concluded that the plaintiff had "good" ability to follow simple job instructions and "fair" ability to maintain personal appearance. (Tr. 379.) Dr. Leftwich noted that he based his findings "on [his] mental health appointment notes." (Tr. 378.)

### 2. Vocational and Consultative Evaluations

On June 23, 2006, Jeanine Nichols, a DDS Vocational Evaluator, completed a Vocational Evaluation Report (tr. 473-79) and assessed the plaintiff's "vocational interests, strengths, potential, and barriers to employment" and identified "specific service and training needs relevant to [his]

8

vocational goals." (Tr. 473.) Ms. Nichols found that the plaintiff had "limited ability to interact with others in a socially acceptable manner" and had "poor work habits due to his disability" as evidenced by his termination from his last four jobs after only 30 to 60 days. *Id.* She noted that the plaintiff lives alone, that he is capable of transporting himself to work, that he served in the Army for eight years, and that he was interested in a job "'where [he] can use [his] mind, imagination, and creativity," and where he could work alone. (Tr. 473-74.) Ms. Nichols concluded that the plaintiff "is capable of entering into competitive employment following the appropriate training, at a skilled to professional level. He would benefit from a formal training program at a vocational/technical community college or university level. Vocational interests are realistic and parallel to his abilities." (Tr. 477.)

On April 2, 2007, Dr. Lawrence Edwards, Ph.D., a DDS examining psychologist, completed a mental assessment (tr. 233-39) and the plaintiff related that he is able "to get on the internet" and socialize with people; "that he is part of Alpha Psi Phi at Tennessee Tech," and that he meets with that group on Saturdays to play games; that he is able "to take care of himself," to cook for himself, to "clean up around his house," and to "take care of his general needs." (Tr. 237.)

Dr. Edwards opined that

[a]lthough [the plaintiff] was referred by his disability examiner for evaluation and assessment for Asperger's syndrome as well as for anxiety, no symptoms [of] either [were] reported by Mr. Evans, nor observed of Mr. Evans during this evaluation would support either of these diagnoses. Specifically, Mr. Evans is clearly able to socialize with others in appropriate manners when necessary. He was able to survive in a military system for nine years, and although he clearly had some sort of disciplinary problems, he was able to maintain that job for a relatively long period of time. In addition, although Mr. Evans reports having difficulty getting along with others, he did not have any significant difficulties interacting with this examiner during the evaluation, and actually his mother at times tended to interfere with his

9

ability to interact as she often jumped in, in attempts to answer questions asked of him.[6]

In sum, no behaviors reported by Mr. Evans nor behaviors observed of Mr. Evans during this evaluation would support a diagnosis of either Asperger's Syndrome or an Anxiety Disorder, nor would they support any other diagnosis of a psychological condition.

(Tr. 236-37.) He also determined that the plaintiff's ability to understand and remember, to sustain concentration or persistence, to interact with others, and to adapt to change was not limited, and he assigned the plaintiff a GAF score of 70-80.[7] (Tr. 238.)

On April 24, 2007, Dr. Horace F. Edwards, Ph.D., a nonexamining DDS consultative psychologist, completed a Psychiatric Review Technique Form ("PRTF") (tr. 215-28) and diagnosed the plaintiff with schizotypal personality disorder and Asperger's. (Tr. 222, 224.) He concluded that the plaintiff had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation. (Tr. 225.)

Dr. Edwards also completed a mental Residual Functional Capacity ("RFC") assessment (tr. 229-32) and opined that the plaintiff was moderately limited in his "ability to maintain attention and concentration for extended periods;" in his "ability to perform activities within a schedule,

---

[6] Dr. Edwards also noted that
although Mr. Evans was clearly capable of answering all questions provided to him, his mother answered most questions, and many questions had to [be] redirected to Mr. Evans for him to answer. In addition, it should also be noted that Mr. Evans wanted his mother to be in this interview and often attempted to defer questions to her to be answered.
(Tr. 235.)

[7] A GAF score within the range of 61-70 means that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). DSM-IV-TR at 34.

10

maintain regular attendance, and be punctual within customary tolerances;" in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" in his "ability to accept instructions and respond appropriately to criticism from supervisors;" in his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" in his "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;" in his "ability to respond appropriately to changes in the work setting;" and in his "ability to set realistic goals or make plans independently of others." (Tr. 229-30.) He also found that the plaintiff was markedly limited in his "ability to interact appropriately with the general public." (Tr. 230.)

### B. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff, his mother, and Jane Hall, a vocational expert ("VE"), testified. (Tr. 13-36.) The plaintiff testified that he completed high school and certified nursing assistant training, worked as a certified nursing assistant, and served in the Army as a medical specialist for over eight years until he was discharged under honorable conditions "in lieu of disciplinary proceedings." *Id*. He related that he also worked as a housekeeper, at a temporary services agency, and at his family's used car lot. (Tr. 17.)

The plaintiff testified that he stopped working at his family's car lot because he began taking classes at Nashville State and that he was currently enrolled at Crossville Technical School ("Crossville Tech") for drafting, attending class five days a week from 7:45 a.m. to 2:15 p.m. (Tr. 18.) The plaintiff related that he is a member of Alpha Psi Phi, which he described as "a group

where a bunch of nerds basically get together and have meetings and have functions," and that he

would attend the groups meetings "once every two weeks or so."[8] (Tr. 18-19.)  He testified that he

is "in good standing in school," that he has not been the subject of any disciplinary proceedings at

school, and that he is typically on time for class. (Tr. 19-20.)  He related that he is able to drive, lives

alone, and does all of his own household chores and cooking. *Id.*

The plaintiff testified that he had worked, through placement by a temporary employment

agency, at a parts factory but that the parts factory "could not place him in a position;" at  Bethesda

Health Care Center but that he was fired after being accused of hurting a patient; at a pill bottling

factory but that he was fired after a week because he did not work quickly enough; at a nursing home

where he was also fired; at Pacesetters for three months before being fired for making inappropriate

comments about the mentally and physically challenged adults for whom he was caring; and at

Bargain City Furniture where he assembled furniture. (Tr. 22-25.)  The plaintiff related that, while

working at Bargain City Furniture, he did not have any difficulty getting along with his co-workers

and that if he "thought there was a simpler way, and a faster way [to assemble furniture], I would

try it because I wanted to get as much work done as possible." (Tr. 25-26.)

As a student, the plaintiff testified that he would occasionally talk to classmates at school but

that "most of the time I focus on my work," that he has difficulty talking with other people about

things that are of interest to him, that he occasionally has difficulty with multitasking, that he

"sometimes" has difficulty getting along with his family and with controlling his temper around his

---

[8] The plaintiff explained that the Alpha Psi Phi social organization was associated with Tennessee Tech and that even though he was not a student at Tennessee Tech, he attended their meetings "for one semester." (Tr. 21-22.)

12

family, that he has problems with keeping doctors appointments, and that he has difficulty concentrating. (Tr. 26-28.)

The plaintiff's mother testified that the plaintiff would wear inappropriate attire to interviews, "like skull clothing, I call it devil clothing, you know, with skulls and flames and things like that on it," and that the plaintiff did not understand that it was not appropriate clothing to wear to interviews. (Tr. 31.) She related that the plaintiff had difficulties while working at their family's used car lot and explained that

> [a]n example I used was someone coming in and asking about a car that they were interested in and then he just starts talking about a subject, and the one in particular that we heard about later from the customer was he started talking about brain surgery and stuff that maybe was on his mind or something, but . . . you just wouldn't do that.

(Tr. 31.) The plaintiff's mother also testified that she helps the plaintiff to remember his appointments and that he has difficulty controlling his anger. (Tr. 32-33.)

The VE classified the plaintiff's past work as a certified nursing assistant as medium and semiskilled and as a medical corpsman as medium and skilled. (Tr. 34.) The ALJ asked the VE to consider what type of work the plaintiff could perform if he did not have any exertional impairments but "would require work involving no more than simple, repetitive, non-detailed tasks; coworker and public contact should be no more than casual and infrequent; supervision direct and non-confrontational; and changes in the work places infrequent and gradually introduced." *Id.* The VE answered that the plaintiff would be precluded from performing his past relevant work but concluded that he would have the RFC to perform work at the medium level and could work as a dishwasher, as a cleaner, or as an assembler. (Tr. 34-35.) Next, the plaintiff's attorney asked the VE

what type of work he could perform given Dr. Leftwich's mental Medical Assessment and the VE answered that he would be precluded from working. (Tr. 35-36.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on July 8, 2009. (Tr. 45-52.)  Based on the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

2. The claimant has not engaged in substantial gainful activity since June 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: Asperger's syndrome (20 CFR 404.1520(c) and 416.920(c)).

* * *

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925, and 416.926).

* * *

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she [sic] can perform only simple, non-detailed tasks; contact with coworkers and the public is casual and infrequent; supervision is direct and non-confrontational; and workplace changes are infrequent and gradually introduced.

* * *

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

14

7.   The claimant was born on March 17, 1974 and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

* * *

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 47-52.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  The Commissioner's

15

decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he

16

seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. Sept. 24, 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed

17

impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent

18

of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five-Step Inquiry

In this case, the ALJ decided the plaintiff's claim at step five of the five step process. (Tr. 50-52.) At step one, the ALJ found that the plaintiff demonstrated that he had not engaged in substantial gainful activity since June 1, 2006, the alleged onset of disability. (Tr. 47.) At step two, the ALJ determined that the plaintiff's Asperger's syndrome was a severe impairment. *Id.* At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 47-48.) At step four, the ALJ determined that the plaintiff could not perform his past relevant work but that he had the RFC to perform work at all exertional levels with the following limitations: that he can only do simple, non-detailed tasks; that his contact with coworkers and the public must be "casual and infrequent;" that his supervision is "direct and non-confrontational;" and that changes to his workplace are

19

"infrequent and gradually introduced." (Tr. 48-50.)  At step five, the ALJ found that the plaintiff's

RFC allowed him to perform work as a dishwasher, cleaner, or assembler. (Tr. 51-52.)

## C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in evaluating the medical findings of his treating

psychiatrist and in determining that he did not meet Listing 12.10. Docket Entry No. 18, at 13-17.

The plaintiff also argues that the ALJ failed to properly evaluate his subjective complaints of pain.

Docket Entry No. 18, at 17-19.

### 1. The ALJ failed to properly evaluate the medical findings of the plaintiff's treating psychiatrist.

The plaintiff contends that the ALJ "fail[ed] to set forth good cause for his rejection" of

Dr. Leftwich's Medical Assessment. Docket Entry No. 18, at 15-17.  According to the Regulations,

there are three different medical sources who may provide evidence: nonexamining sources,

nontreating sources, and treating sources.  A nonexamining source is "a physician, psychologist, or

other acceptable medical source[9] who has not examined [the claimant] but provides a medical or

other opinion in [the claimant's] case."  20 C.F.R. §§ 404.1502, 416.902.  A nontreating source is

described as "a physician, psychologist, or other acceptable medical source who has examined [the

claimant] but who does not have, or did not have, an ongoing treatment relationship with [the

claimant]." *Id.*  The Regulations define a treating source as "[the claimant's] own physician,

---

9 The Regulations define acceptable medical sources as licensed physicians, both medical
and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed
podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

psychologist, or other acceptable medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations characterize "an ongoing treatment relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Given the regularity that Dr. Leftwich examined the plaintiff he is classified as a treating source under 20 C.F.R. §§ 404.1502, 416.902. *See* Tr. 196-97, 204-07, 279, 282, 285, 294-95, 330, 345, 378-80. Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010) and *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion

with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5), and so that the plaintiff understands the disposition of his case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[10] *Wilson*, 378 F.3d at 544-45.

In this case, the ALJ focused on the factors of inconsistency and supportability in assigning no weight to Dr. Leftwich's Medical Assessment and explained that the medical evidence did not reflect the severity of limitations that he had assigned the plaintiff and that "[his] findings are also

---

[10] The rationale for the "good reason" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in her case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

22

inconsistent with the claimant's self-reported level of functioning."[11] (Tr. 50.)  The ALJ concluded that the plaintiff had the RFC to perform work at all exertional levels with the following limitations: that he can only do simple, non-detailed tasks; that his contact with coworkers and the public must be "casual and infrequent;" that his supervision is "direct and non-confrontational;" and that changes to his workplace are "infrequent and gradually introduced," and he noted that "the findings of Dr. Marshman and the results of the claimant's vocational assessment" supported that determination. (Tr. 49-50.)

The Court finds that the ALJ did not provide sufficient support for his determination to assign no weight to Dr. Leftwich's Medical Assessment.  First, although the ALJ does not specify what medical evidence undercut's Dr. Leftwich's findings, it can be inferred that he is referring to Dr. Marshman's March 22, 2006, neuropsychological evaluation and Ms. Nichols' June 23, 2006, Vocational Evaluation Report since he noted that both assessments support his RFC determination and he assigned significant weight to Dr. Marshman's evaluation. (Tr. 49-50.)  Dr. Marshman is an examining neuropsychologist, but she examined the plaintiff on only one occasion and that examination took place over two months before his alleged onset date. (Tr. 202.)  Ms. Nichols, an examining vocational evaluator, assessed the plaintiff on one occasion and that assessment took place only three weeks after the plaintiff's alleged onset date. (Tr. 473-79.)  Dr. Marshman is

_____

[11] The ALJ cited the plaintiff's "involvement in a fraternity" as an example of his self-reported level of functioning.  However, there is no evidence in the record that Alpha Psi Phi, despite its "Greek" name, is really a fraternity. (Tr. 50.)

classified as a nontreating medical source and Ms. Nichols is classified as an "other source."[12] *See* 20 C.F.R. §§ 404.1513, 404.1502, and 416.902.

Both Dr. Marshman and Ms. Nichols noted that the plaintiff's Asperger's would affect his ability to work and limit his ability to interact socially with others, but they determined that he would benefit from a vocational rehabilitation program and a skill-based therapy program (tr. 202-03) or "a formal training program at a vocational/technical community college or university level." (Tr. 477.) The plaintiff received psychiatric treatment from Dr. Leftwich between April of 2006, and April of 2009 (tr. 196-97, 204-07, 279, 282, 285, 294-95, 330, 345, 378-80), and received psychotherapy from Dr. Campbell between January of 2008, and January of 2009. (Tr. 277, 284,

---

[12] The Regulations define other sources as

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);

(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);

(3) Public and private social welfare agency personnel; and

(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d). Social Security Ruling ("SSR") 06-03p provides that

[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)).

24

290-91, 293, 327, 330.)  Given the regularity with which Dr. Campbell examined the plaintiff, he too is classified as a treating physician. *See* 20 C.F.R. § 404.1502.

The record contains a Medical Assessment from Dr. Leftwich, but the record does not contain an evaluation by Dr. Campbell regarding the limiting effects of the plaintiff's Asperger's. The Court cannot conclude that the ALJ's decision to assign no weight to Dr. Leftwich's Medical Assessment is supported by the record medical evidence when the record does not contain a mental RFC evaluation from Dr. Campbell, the plaintiff's only other treating mental health physician besides Dr. Leftwich.  Instead, as discussed *supra*, the ALJ points to the findings of Dr. Marshman and Ms. Nichols as support for the mental RFC that he assigned the plaintiff but neither Dr. Marshman nor Ms. Nichols have the longitudinal treatment perspective that Dr. Leftwich and Dr. Campbell had, since they each only evaluated the plaintiff on one occasion that was either before or less than one month into the plaintiff's alleged period of disability.  Further, the ALJ did not explain why he assigned significant weight to the findings of a nontreating psychologist and a nontreating vocational evaluator  instead of to Dr. Leftwich, a treating psychiatrist. (Tr. 49-50.)

Next, the ALJ points to the plaintiff's "self reported level of functioning" as evidence that undercuts Dr. Leftwich's Medical Assessment, apparently focusing on the plaintiff's enrollment at two different community colleges. (Tr. 49-50.)  The plaintiff related that in the fall of 2007, he took eight credit hours at Nashville State (tr. 299) and at his 2009 hearing, he testified that he was "currently enrolled in the Crossville Tech school for drafting," that "the classes run Monday to Friday, 7:45 to 2:15," and that he attended class every day but he did not detail his daily schedule.[13]

---

[13] The plaintiff did testify that he tried "to work through breaks and lunch to, to get the maximum amount of work done." (Tr. 26.)

25

(Tr. 18.) The plaintiff's Nashville State transcript indicates that he took nine credit hours in the fall of 2007, that he took five credit hours in the spring of 2008,[14] and that he received no credit for the one class he took in the fall of 2008 because he failed it, and his transcript from Crossville Tech indicates that he took two classes in the spring of 2009, but it does not show the number of course hours in which he was enrolled. (Tr. 375-76.)

Simply put, the plaintiff's ability to take community college level classes could mitigate the significant limitations that Dr. Leftwich assigned to him, but his course load during his period of disability is not consistent and it is difficult for this Court, without additional information, to conclude that it undercuts Dr. Leftwich's Medical Assessment and supports a finding that the plaintiff is able to work eight hours a day for five days a week. It would be helpful if the record had been developed further by asking Dr. Leftwich how the plaintiff's eight year military career and enrollment in two different community colleges affected his findings that the plaintiff had poor or no ability to deal with work stresses; function independently; maintain attention concentration; understand complex and detailed job instructions; behave in an emotionally stable manner; relate predictably in social situations; or demonstrate reliability.[15] (Tr. 378-79.)

---

[14] His Nashville State transcript shows that he withdrew from one class during the 2008 spring semester. (Tr. 375.)

[15] The Commissioner cites *Bradberry v. Astrue*, 2009 WL 2027111, *15 (M.D. Tenn. July 8, 2009), as a similar case in terms of facts and rationale. Docket Entry No. 19, at 8-10. In *Bradberry*, the Court affirmed the Commissioner's decision denying benefits to the plaintiff who also had been diagnosed with Asperger's and who had completed two years of college and had worked as a university instructor and a medical supply representative visiting customers' homes for five years immediately before his alleged onset date, had a family, was a rescue squad member, and participated in avocations and family activities. *Bradberry*, 2009 WL 2027111, *11. Although the plaintiff in this case served over eight years in the military, he has been unable to maintain employment for any length of time since he was discharged from the military in early 2002. *See* tr. 22-26, 124-15, 171. The Court further notes that the plaintiff's last enlistment was not without

Finally, the record should also be developed further by seeking clarification from Dr. Leftwich on how he arrived at the limitations that he assigned the plaintiff in his Medical Assessment. Dr. Leftwich explained that his findings were "[b]ased on mental health appointment notes," but he did not point to specific treatment notes that support his findings that the plaintiff had poor or no ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stresses; function independently; maintain attention concentration; understand complex and detailed job instructions; behave in an emotionally stable manner; relate predictably in social situations; or demonstrate reliability. (Tr. 378-79.)

In sum, although the ALJ determined that Dr. Leftwich's Medical Assessment was inconsistent with and was not supported by the medical evidence in the record, the ALJ's rationale for arriving at that conclusion was not sufficiently specific for this Court or the plaintiff to understand the disposition of his case. *See Wilson*, 378 F.3d at 544. The ALJ apparently relied on evaluations by Dr. Marshman and Ms. Nichols and on the plaintiff's community college course work to discredit Dr. Leftwich's Medical Assessment, but Dr. Marshman is not a treating physician and Ms. Nichols is not a treating acceptable medical source, since both examined the plaintiff on only one occasion. Therefore, this case should be remanded for the ALJ to develop the record by requesting that Dr. Campbell, the plaintiff's treating psychologist, complete a mental RFC evaluation and address how the plaintiff's eight year military service and enrollment in community college courses affect those findings; by requesting that Dr. Leftwich provide specific examples

---

problems, *see* tr. 431-459, and, in his commanding officer's recommendation that the plaintiff be generally discharged, he wrote that "[t]his trooper is a burden to his chain of command. The general discharge recommendation results from the soldier's conditional agreement to waive Separation Board proceedings." (Tr. 417.) The plaintiff's employment history, if nothing else, distinguishes this case from *Bradberry*.

from his treatment notes to support his Medical Assessment and explain how the plaintiff's eight year military career and enrollment in community college affect that assessment; and by specifically explaining why he assigned no weight to Dr. Leftwich's findings, the plaintiff's treating physician, and significant weight to Dr. Marshman and Ms. Nichols, who were not treating medical sources.

The Court will not address the plaintiff's remaining allegations of error since resolving whether Dr. Leftwich's Medical Assessment is consistent with and supported by the medical evidence in the record is a threshold issue and may be dispositive of the plaintiff's claim.[16] *See* Tr. 35-36.

## VI. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 17) be GRANTED to the extent that the case should be remanded to the ALJ to develop the record by requesting that Dr. Campbell complete a mental RFC evaluation and address how the plaintiff's eight year military service and enrollment in community college courses affect those findings; by requesting that Dr. Leftwich explain how the plaintiff's eight year military career and enrollment in community college classes affect the findings in his Medical Assessment and to pinpoint specific examples from his treatment notes that support his assessment; and, thereafter, to properly evaluate and explain the weight assigned to Dr. Leftwich's Medical Assessment and Dr. Campbell's evaluation.

---

[16] The VE testified that the limitations that Dr. Leftwich assigned to the plaintiff in his Medical Assessment would preclude him from working. (Tr. 35-36.)

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge